# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID W. COLLINS,<br><br>　　　　　　　Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA,<br>　　　　　　　Defendant. | CASE NO. 11cv2072 WQH (DHB)<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

HAYES, Judge:

　　The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## BACKGROUND

　　This is a seaman's action for personal injury and damages arising from an incident which occurred on January 6, 2010, on board the vessel SS Curtiss ("Curtiss"), a public vessel owned by Defendant United States of America. Specifically, Plaintiff fell on a stairway while walking backwards up the stairs carrying a piece of equipment. At the time of the incident, Plaintiff David W. Collins was a member of the crew of the Curtiss.

　　On September 8, 2011, Plaintiff initiated this action by filing a Complaint in this Court. (ECF No. 1). The Complaint asserts three cause of action: (1) negligence under the Jones Act, 46 U.S.C. §§ 30104, *et seq.*, and general maritime law, (2) unseaworthiness under general maritime law, and (3) maintenance and cure.

A bench trial as to the first and second causes of action took place on August 21-22, 2013. (ECF Nos. 37, 38). Prior to the presentation of evidence, the Court dismissed the third cause of action for maintenance and cure with prejudice and without objection by Plaintiff. Plaintiff contends that the United States was negligent and the Curtiss was unseaworthy because the stairway at issue did not have handrails installed and the edge of the hatch at the top of the stairway was not covered with nonskid paint. The United States contends that it was not negligent and the Curtiss was not unseaworthy. The United States contends that Plaintiff's injuries were solely caused by Plaintiff's imprudent decision to carry a heavy item up the stairway in an unsafe manner despite having safer alternatives available to move the item. The United States alternatively contends that Plaintiff's claims are barred by application of the primary duty rule.[1]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has subject-matter jurisdiction over this action pursuant to the Clarification Act, 50 App. U.S.C. §1291, and the Suits in Admiralty Act, 46 U.S.C. §§ 30901, *et seq*.

## I.  *Factual Background*

The Curtiss is a public vessel owned by the United States by and through the Department of Transportation, Maritime Division and operated by Crowley Technical Management ("Crowley"). The vessel is part of the United States' Ready Reserve Fleet. The Curtiss is a "stick boom" cargo vessel that has been modified to support a Marine Corps helicopter squadron. The vessel is capable of being loaded with large containers that have been converted into specialized workshops in which the Marines perform repair and maintenance on helicopters and fixed-wing aircraft. As part of its modification, the Curtiss was fitted with a helicopter pad, barracks for the Marines, and

---

[1] The United States also contends that "[t]o the extent [Plaintiff] contends that his injury was caused by a negligent design of the Curtiss, that is, his injury was caused by the design of the steps leading up to the top of hatch 6, the Court would not be vested with subject matter jurisdiction under the discretionary function exception to the waiver of the sovereign's immunity." (ECF No. 33 at 21-22). The Court does not reach this issue.

four sets of steps leading up to the hatch covers upon which the workshops were placed for the Marines. The steps were placed aboard the vessel to provide the Marines access to their workshops. The steps leading up to hatch number six were designed with removable stanchions and chain handrails. The stanchions and handrails were designed to be removable because the stanchions would interfere with the opening of hatch number six if they were not removed. When the stanchions and handrails were not in place, they were stored next to the steps leading up to hatch number six.

Upon graduating high school in 1990, Plaintiff attended the Seaman's International Union Merchant Marine facility in Piney Point, Maryland. Upon completion of his training, Plaintiff began his Merchant Marine career as an Ordinary Seaman and member of the Seaman's International Union. At the time of the incident at issue, Plaintiff was 39 years old and was an "Able-Bodied Seaman" with over twenty years of experience in the Merchant Marine.

In addition to being an Able-Bodied Seaman, Plaintiff was the "Bosun" aboard the Curtiss. As the ship's Bosun, he was the highest-ranking unlicensed member of the deck crew. Plaintiff served as Bosun aboard the Curtiss for approximately five years, from 2005 until the incident at issue in 2010. As Bosun, Plaintiff was the foreman of the deck crew and was in charge of the unlicensed crewmembers of the deck department, which is made up of "Ordinary and Able-Bodied Seaman." Plaintiff was the first link in the chain of command onboard the ship, acting as the intermediary between the unlicensed seamen and the ship's officers. Crewmembers would bring any concerns regarding the operation of the vessel, including safety concerns, to Plaintiff, who would voice those concerns to the ship's officers.

In addition to serving as the ship's Bosun, Plaintiff was the Union Steward onboard the vessel. As the Union Steward, Plaintiff was responsible for protecting the rights of all the unlicensed crewmembers below him, not only those in the deck department, who he was in charge of, but also those in the steward department and the engine room. If an unlicensed member of the crew had safety concerns, he or she

would voice their concerns to Plaintiff, as the Bosun and Union Steward. Plaintiff was responsible for ensuring that the crewmember's safety concerns were addressed.

At all relevant times, Crowley had in place written job safety procedures that all crewmembers, licensed and unlicensed, were trained in and were required to follow. Under Crowley's job safety procedures, Plaintiff was responsible for ensuring that a job safety analysis was carried out prior to any job that, in his mind, involved non-routine or potentially-unsafe lifting. Plaintiff had conducted many such analyses, and had completed over 100 "Job Safety Analysis" forms prior to the date of the incident. On several of these Job Safety Analysis forms, Plaintiff identified "improper lifting" as a potential hazard associated with a task involving heavy lifting. Less than one month prior to the incident, Plaintiff participated in a ship's safety meeting, the topic of which was back care for the maritime industry. A video was shown at this meeting demonstrating proper lifting techniques. In addition, the participants were provided a handout covering safety and proper lifting. The crew aboard the Curtiss had a general practice that if a crewmember thought an item was too heavy to be carried up stairs, then the item should not be carried up stairs.

Throughout his 20-year experience as a merchant seaman, Plaintiff received on-the-job training in lifting heavy objects, and using a ship's booms and cranes. One of Plaintiff's duties as the Bosun of the Curtiss was to assist contractors working onboard the vessel with certain tasks, such as operating the ship's booms to assist contractors needing to lift equipment onto or off of the vessel. Crewmembers aboard the Curtiss are trained to lift and move objects in a safe manner. Even in the absence of conducting a job safety analysis, Plaintiff was trained to go through a checklist of the necessary steps prior to performing every job involving lifting in order to assess how the lift can be done safely. Part of Plaintiff's training aboard the Curtiss involved looking into safer options to performing a task involving lifting.

On January 6, 2010, the Curtiss was moored to Pier 9 at the 32nd Street Naval Station in San Diego, California. That morning, Plaintiff had a meeting with Chief

1   Mate Scott Kreger, to discuss the work planned for that day.  Plaintiff was aware that
2   outside painting contractors would be coming onboard to continue their ongoing lead
3   abatement project.  When the abatement contractors arrived, Plaintiff used one of the
4   ship's cargo booms to load the contractors' equipment onto the ship.  Thereafter, he
5   joined another crewman who was chipping and painting the gangway.

6         The same day, an employee of another contractor, Radio Holland, was onboard
7   the vessel removing radio and radar equipment from the Bridge Deck, which is three
8   decks above the Main Deck.  Radio Holland had been working aboard the Curtiss for
9   several weeks prior to January 6, 2010.  After a lunch break on January 6, 2010, the
10  Radio Holland employee, William Gillette, approached Chief Engineer Roy Silliker and
11  asked if Gillette could use the ship's boom to off-load old equipment and tools.
12  Silliker, consistent with standard procedure aboard the Curtiss, referred Gillette to
13  Plaintiff, whose duty as the ship's Bosun included assisting contractors and operating
14  the ship's booms.

15        Gillette asked Plaintiff to assist him in removing an old radio transceiver.  The
16  transceiver was approximately four feet by two feet by one and a half feet, and weighed,
17  according to Plaintiff's estimate, between 100 and 150 pounds.[2]  Gillette had already
18  removed the transceiver from its mounting bracket on the aft bulkhead in the Radio
19  Room and placed it on a four-wheeled cart.  Plaintiff selected the route he and Gillette
20  would take for off-loading the transceiver from the Curtiss.  Plaintiff and Gillette
21  proceeded to wheel the cart out of the Radio Room, down a hallway and into the ship's
22  elevator.  Plaintiff and Gillette then proceeded to the Main Deck.  Once on the Main
23  Deck, Plaintiff and Gillette wheeled the cart to the stairway leading up to the top of
24  port-side hatch cover number six, where a flat rack had been placed.  The flat rack was
25  used to load and off-load items onto and off of the ship.

26        Once the cart with the transceiver was in place near the six-step stairway leading

27

28        [2] Gillette estimated that the transceiver weighed approximately 70 pounds.

1   up to the top of hatch cover number six, Plaintiff intended to carry the transceiver with
2   Gillette up the stairway to the flat rack. The stanchions and chain handrails were not
3   in place at the time. Plaintiff testified that he did not "view carrying [the transceiver]
4   up those steps without stanchions in place as a safe way" to accomplish the task of
5   moving the transceiver into position to be off-loaded from the vessel.³ (Tr. Trans. at 90,
6   ECF No. 52). Despite his safety concerns, Plaintiff did not stop the task in order to
7   conduct a job safety analysis or consider other, safer options for moving the transceiver.
8   Plaintiff proceeded to carry the transceiver up the steps with Gillette, with Plaintiff in
9   the lead, walking up the steps backwards. At some point while carrying the transceiver
10  backwards up the steps, Plaintiff fell into a sitting position on the edge of the hatch
11  cover, with the transceiver coming down on his right leg. Plaintiff then stood up, and
12  continued to carry the transceiver with Gillette to the flat rack.

13  Thereafter, Plaintiff informed a fellow crewmember, Milton Seril, of the incident
14  and stated that he had hurt his right leg. Seril informed Chief Mate Kreger of the
15  incident. Kreger immediately went to hatch number six to assist Plaintiff. After
16  assessing the situation, Kreger advised Plaintiff to go rest in the crew lounge. Kreger
17  began an accident investigation. After resting in the lounge, Plaintiff was taken to
18  University Hospital in San Diego by Chief Engineer Silliker. Plaintiff was diagnosed
19  with a bruise to the right leg. Plaintiff's treating physician declared Plaintiff permanent
20  and stationary on November 9, 2010. The last time Plaintiff was seen by his treating
21  physician for his leg injury was on November 9, 2010. Plaintiff has not pursued any
22  employment since the date of the incident, January 6, 2010.⁴

---

³ Plaintiff also testified that, as the Bosun and Union Steward, Plaintiff would not have allowed his charges to routinely do something that was unsafe.

⁴ Plaintiff contends that, due to the transceiver hitting his leg on January 6, 2010, Plaintiff has been unable to resume his duties aboard the Curtiss from January 6, 2010 to the date of trial. The United States contends that Plaintiff has failed to provide expert medical testimony upon which the Court could determine that the incident at issue caused all of Plaintiff's alleged injuries. Because of the Court's findings of fact and conclusions of law contained herein, the Court does not reach this issue.

## II. *Negligence and Unseaworthiness*

"To recover on [a] Jones Act claim, [a plaintiff is] required to establish by a preponderance of the evidence: (1) negligence on the part of his employer (or one for whom the employer is responsible), and (2) that the negligence was a cause, however slight, of his injuries." *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993) (citing *Hechinger v. Caskie*, 890 F.2d 202, 207 (9th Cir.1989)). The Jones Act "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of [the employer's] liability is [the employer's] negligence, not the fact that injuries occur." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (discussing the standard of liability under the Federal Employers' Liability Act, 45 U.S.C. § 51); *see also Hechinger*, 890 F.2d at 208 (stating that the Jones Act provides seamen the cause of action and judicially developed doctrine of liability granted to railroad workers by the Federal Employers' Liability Act).

"To establish a claim for unseaworthiness, [a plaintiff] must establish: (1) the warranty of seaworthiness extended to him and his duties; (2) his injury was caused by a piece of the ship's equipment or an appurtenant appliance; (3) the equipment used was not reasonably fit for its intended use; and (4) the unseaworthy condition proximately caused his injuries." *Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 664 (9th Cir. 1997) (citations omitted). "'The standard is not perfection, but reasonable fitness.' The owner is not an insurer. In other words, a seaman is not absolutely entitled to a deck that is not slippery. He is absolutely entitled to a deck that is not unreasonably slippery." *Lieberman v. Matson Navigation Co.*, 300 F.2d 661, 662 (9th Cir.1962) (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)); *see also Ribitzki*, 111 F.3d at 665 ("Although Ribitzki was not entitled to a perfect work space, he was entitled to one which was neither unreasonably cramped nor unreasonably slippery.").

### A. *Safer Available Alternatives*

In this case, Plaintiff testified that he did not view carrying the transceiver up the

steps without stanchions as safe, and that he failed to consider any other options for off-loading the transceiver from the vessel. Before carrying the transceiver up the steps in an unsafe manner, Plaintiff should have conducted a job safety analysis as required by Crowley's job safety procedures. A job safety analysis would have identified the risks associated with the task of off-loading the transceiver and identified safer means of accomplishing it. Even in the absence of performing a formal job safety analysis, Plaintiff should have considered and used one of the several safer methods readily available to Plaintiff to accomplish the task of off-loading the transceiver, as Plaintiff was trained to do aboard the Curtiss. For example, Plaintiff testified that it was possible for Plaintiff and Gillette to lift the transceiver and place it on the hatch, and then walk up the short stairway without carrying the transceiver up the steps. Prior to the incident, Plaintiff had seen crewmembers using this technique for unloading food stores from the Curtiss.

Defendant's expert, Captain John Betz, testified that in his opinion there were several safer methods available to Plaintiff to accomplish the task of off-loading the transceiver from the vessel. Plaintiff could have used a cargo sling and either boom number eight, located forward of the number five port hatch, or boom number ten, located aft of the ship's number six port hatch, to hoist the transceiver directly from the Main Deck to the dock. Plaintiff could have used a lifting tackle to hoist the transceiver from the Main Deck up onto the top of the number six port hatch cover, thus eliminating the need to carry it up the stairway. Another alternative available to Plaintiff would have been to use the four-wheel dolly to move the transceiver from the Radio Room to the aft Boat Deck, and then use the life-raft davit and a tagline to lower the transceiver onto the dock. Using any of these options would have meant that Plaintiff would not have been required to carry the transceiver up the stairway.

Plaintiff testified that he could not have used either of the ship's booms to lift the transceiver directly from the Main Deck to the dock because both were out of reach and the booms' limit switches would not make it possible. The Court does not find this

testimony to be credible in light of the more credible testimony of Chief Mate Kreger, the testimony of Defendant's expert Betz, and portions of the testimony of Plaintiff's expert, William Trenkle.  Kreger testified that the crew used the vessel's booms to lift items from the Main Deck in the same location near the steps at hatch number six where Plaintiff testified the booms could not reach.  Kreger testified that he had used the vessel's booms to lift the fenders that provide protection to the vessel when smaller vessels come along side to provide supplies to the Curtiss.  While under way, the fenders are stored near the steps leading up to hatch cover number six.

      Plaintiff's expert Trenkle conceded on cross-examination that the alternative methods outlined by Betz were available to Plaintiff.  However, in Trenkle's opinion the alternatives would not have been practical, because they would have taken more time and, in some cases, more manpower to complete.  In Trenkle's opinion, when carrying out tasks onboard a merchant vessel, such as the Curtiss, a seaman must strike a balance between safety and practicality.  In Betz's opinion, a seaman should never balance safety against practicality; safety always comes first.  The Court finds Betz's opinion in this regard to be more credible.

      Upon considering the opinions of both experts and the other witnesses, the Court finds that there were safer alternatives reasonably and readily available to Plaintiff to off-load the transceiver which would not require Plaintiff to carry the transceiver up the steps.  Although the alternatives outlined by Betz and other witnesses may have required more time and manpower, the Court finds that Plaintiff had the time, training and additional manpower readily available to safely complete each of the alternative methods.  At the time of the incident, the Curtiss was inactive and on reserve status. There was no time pressure on Plaintiff to complete the task of off-loading the transceiver.  In addition to Gillette, Plaintiff could have requested the help of fellow crewmember Milton Seril, who was a member of the deck department and was supervised by Plaintiff, and/or the general utility crewman, known aboard the Curtiss as the "Goodie."  Even if a seaman must strike a balance between safety and practicality

as suggested by Trenkle, the Court finds that, based upon the circumstances facing Plaintiff at the time of the incident, the balance between safety and practicality clearly favored moving the transceiver using one of the safer alternatives reasonably and readily available to Plaintiff.

### B.     *Stanchions and Handrails*

At the time Plaintiff decided to walk backwards up the steps to the top of hatch six while carrying the transceiver, the removable stanchions and chain handrails that serve as handrails while the hatch is closed were not in place. Plaintiff testified that he believed that had the stanchions and chain handrails been in place, he would not have been injured in the accident. Based upon the credible testimony of Chief Engineer Silliker and Chief Mate Kreger, there were several sets of stanchions and chain handrails available for Plaintiff to use, including a set of stanchions and chain handrails next to the hatch six steps. The policy and practice aboard the Curtiss at the time was that the stanchions and handrails were to be put in place by any crewmember if the crewmember felt they were needed.[5] The Court finds no negligence on the part of the United States or unseaworthiness related to the stanchions and handrails.

### C.     *Nonskid Paint*

Plaintiff's expert Trenkle opined that the lack of nonskid paint on the thin raised metal edge of the hatch cover, located above the top step of the stairs leading to the top of hatch cover six, caused Plaintiff to slip and fall, and was thus the cause of Plaintiff's alleged injury. Trenkle testified that Plaintiff could not have looked behind him to ensure that he placed his foot securely on the nonskid paint on top of hatch six, directly

---

[5] Plaintiff testified that in 2006 he was ordered by the first engineer on the Curtiss not to use the stanchions and handrails even when the hatch was closed. Plaintiff testified that he believed this was a standing order which applied on the day of the accident, January 6, 2010. The Court does not find this testimony to be credible in light of the more credible testimony of Chief Engineer Silliker and Chief Mate Kreger, who testified that no such order was given by an officer on the vessel. The more credible testimony is that the policy and practice aboard the Curtiss at the time of the incident was that the stanchions and handrails were to be put in place by any crewmember if the crewmember felt they were needed.

behind the thin raised edge in question. The Court does not find these opinions to be credible. First, as discussed above, the Court finds that Plaintiff should not have been carrying the transceiver up the stairway while walking backwards. Second, Plaintiff should have installed the readily available stanchions and handrails, which Plaintiff testified would have prevented his injuries. Third, having decided to carry the transceiver up the stairway while walking backwards, Plaintiff should have been more attentive and taken care to watch his step. Had he been doing so, he would have placed his foot securely on the nonskid yellow paint on top of hatch six, thereby providing him secure footing. Plaintiff testified that had he looked down and placed his foot on the nonskid on top of hatch six, he would not have slipped. The Court finds that the lack of nonskid paint on the raised metal edge of hatch six was not a cause of Plaintiff's accident. Plaintiff's accident was caused solely by his own unilateral decision to carry the transceiver up the stairway while walking backwards and without installing the stanchions and handrails—despite having safer alternatives readily available—and not taking care to watch his step as he did so.

The Court finds that no negligence on the part of the United States, or its agents or employees, caused, or contributed in any manner to, Plaintiff's injuries. Plaintiff has not met his burden of proof under the Jones Act, and has not established that his injuries were caused by any negligence on the part of the United States. Accordingly, Plaintiff's claim of negligence under the Jones Act and general maritime law is dismissed and judgment shall be entered in favor of the United States as to Plaintiff's first cause of action.

The Court finds that the Curtiss was properly manned and properly equipped. The Court finds that the Curtiss and its appurtenances were fit for their intended purpose and that no unseaworthiness of the vessel caused, or contributed in any manner, to Plaintiff's injuries. Based upon the evidence presented, the Court finds that the stairway leading up to hatch six was reasonably fit for its intended purpose. Plaintiff has not met his burden of proof to establish either that the stairway was not reasonably

fit for its intended use or that any unseaworthy condition proximately caused his injuries. Accordingly, Plaintiff's claims of unseaworthiness are dismissed and judgment shall be entered in favor of the United States as to Plaintiff's second cause of action.

### III.   *Primary Duty Rule*

The United States alternatively contends that Plaintiff's claims are barred by the application of the primary duty rule. "Under the primary duty rule, a seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment." *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095-96 (9th Cir. 2002) (citing, *inter alia*, *Wilson v. Maritime Overseas Corp.*, 150 F.3d 1, 11 (1st Cir. 1998) ("The primary duty rule provides that a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel.")). The primary duty rule "is in tension with the more general admiralty principle that contributory negligence and assumption of the risk are not bars to a seaman's recovery against his employer for personal injury, but serve only to mitigate his damages. As a result, the courts have cabined the reach of the primary duty rule, lest it go too far." *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 906 (9th Cir. 1994) (citation omitted). "Accordingly, in order for an employer to relieve itself of liability under the primary duty rule: (1) the seaman must have consciously assumed a duty as a term of employment; (2) the dangerous condition that injured the seaman must have been created by the seaman or could have been controlled or eliminated solely by the seaman in the proper exercise of his or her employment duties; and (3) the seaman must have knowingly violated a duty consciously assumed as a condition of employment." *N. Queen Inc.*, 298 F.3d at 1095 (quotation omitted).

For example, the Court of Appeals for the Ninth Circuit has held that a munitions ship's chief mate who fell through sheathing on the floor of the cargo hold could not

recover against the United States for his resulting injuries. The mate's duties included overseeing safe working conditions on the vessel. He breached the duty by failing to repair sheathing that he knew was damaged and by failing to provide sufficient lighting for a person to see the damaged sheathing and step around it. The Ninth Circuit held that because the mate's injuries resulted from the breach of a duty that he had consciously assumed as a term of his employment, his Jones Act claims were barred by the primary duty rule. *See Reinhart v. United States*, 457 F.2d 151, 153-54 (9th Cir. 1972).

Plaintiff, as the Bosun, consciously assumed certain specific and well-defined duties with regard to the safety and supervision of operations entailing lifting objects aboard the Curtiss. Plaintiff's injury was caused solely by his decision to carry the transceiver up the steps to hatch cover six while walking backwards and without the stanchions and handrails in place. Plaintiff made the decision to carry the transceiver up the steps despite believing that doing so was unsafe, and despite having the training, knowledge, tools, manpower and time available to offload the transceiver without carrying it up the steps. The dangerous condition at issue—carrying the transceiver up the stairs while walking backwards and without stanchions and handrails in place—could have been controlled or eliminated solely by Plaintiff in the proper exercise of his employment duties. By carrying the transceiver up the stairs while walking backwards and without stanchions and handrails in place, Plaintiff knowingly violated a duty consciously assumed as a condition of employment. Even if Plaintiff had established the required elements of either of Plaintiff's causes of action, the Court finds that the United States has established that the elements required to find a breach of a primary duty owed by Plaintiff as Bosun to the United States as vessel owner are met, and application of the primary duty rule bars Plaintiff's recovery from the United States.

## CONCLUSION

IT IS HEREBY ORDERED that the Clerk of the Court shall enter judgment in

1  favor of Defendant and against Plaintiff as to all claims in the Complaint.
2  DATED:  December 6, 2013

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge